JUDGE JONES

07 CV 11389

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

                            Plaintiff,

         v.

IAN G. PARK,

                            Defendant.

Civil Action No. ___

COMPLAINT



Plaintiff Securities and Exchange Commission (the "Commission") alleges:

## NATURE OF THE ACTION

1. During January 2003, defendant Ian G. Park made material misstatements and omissions to the investing public as part of the promotion of two related companies: Renaissance Mining Corporation ("Renaissance"), a private company purportedly engaged in gold mining; and Sedona Software Solutions, Inc. ("Sedona"), a publicly-traded shell company with which Renaissance claimed to have merged.

2. Defendant Park was the co-founder, chief executive officer, president, and a director of Renaissance from September 2002 through March 2003. Beginning in early January 2003, Park and Renaissance publicly disseminated information that created the false appearance that Renaissance had acquired three Central American gold mines and was the "Leading Gold Producer in Latin America." At that same time, behind the scenes, Park and others were attempting to raise the funds necessary to acquire the mines that Renaissance publicly claimed to

own, and merge Renaissance with Sedona, a publicly-traded shell company. Park and others disseminated false and materially misleading information to the public to convince potential investors that Renaissance had already acquired the mines, that the mines were fully operational, and that a lucrative investment in *Renaissance* could be made by purchasing *Sedona's* shares on the Over-the-Counter Bulletin Board ("OTCBB") – even though Renaissance was not an operating mining company, owned no mines, and had not actually merged with Sedona.

3.   Beginning on January 21, 2003, Renaissance and Sedona publicly announced their proposed merger and, in response to Renaissance's false and misleading promotional activities, numerous public investors purchased Sedona stock at between $9 and $10 per share.

4.   Starting in mid-January 2003, Renaissance initiated a $6 million private stock offering to finance the acquisition and activation of the gold mines. Renaissance's private Offering Memorandum, which was distributed to prospective investors, contained material misstatements and omissions about Renaissance's capital structure, the cost of acquiring and operating the mines, Sedona's share price, and Sedona's officers, directors, and controlling shareholders. In addition, Renaissance's offering did not qualify for an exemption from the registration requirements of the federal securities laws and, as a result, was an unlawful unregistered public offering. Park shared responsibility for the preparation and dissemination of this offering memorandum to prospective investors.

5.   On January 29, 2003, the Commission suspended trading in Sedona's stock because of questions concerning the accuracy and completeness of public information about Sedona and Renaissance.

6.   By virtue of his conduct, defendant Park knowingly or recklessly participated in a manipulation with regard to the securities of Renaissance and Sedona. Accordingly, Park

directly or indirectly violated, and unless restrained and enjoined will continue to violate, Sections 5(a), 5(c) and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77e(a), 77e(c) and 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5].

## JURISDICTION

7. This Court has jurisdiction of this action pursuant to Sections 20 and 22(a) of the Securities Act [15 U.S.C. §§ 77t, 77v(a)], and Sections 20, 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78t, 78u(d) and 78aa].

8. Defendant, directly or indirectly, has made use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the acts, practices, and courses of business alleged herein.

## DEFENDANTS

9. Ian G. Park, age 60, is a Canadian citizen residing in Toronto, Ontario. Park was chief executive officer, president, and a director of Renaissance during the relevant period.

## OTHER RELEVANT ENTITIES

10. Renaissance Mining Corporation was a privately-held Delaware corporation with its headquarters in Boulder, Colorado during the relevant period.

11. Sedona Software Solutions, Inc. was, at all relevant times, a Nevada corporation based in Vancouver, British Columbia, Canada. During the relevant period, Sedona's stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act, and was traded and quoted on the OTCBB under the ticker symbol "SSSI." On January 29, 2003, the Commission suspended trading in Sedona securities for ten days. On June 30, 2006, Sedona filed a Form 15 with the Commission to terminate its Exchange Act Section 12(g) registration.

## FACTUAL ALLEGATIONS

12. In late September 2002, Park and another individual formed Renaissance to engage in gold mining and exploration. During the relevant period, Renaissance had no revenues, no non-cash assets, and conducted no business. Park owned 550,000 restricted shares of Renaissance stock, representing approximately twelve percent of the outstanding shares.

13. Beginning in early January 2003, Renaissance publicly disseminated false and misleading information that created the impression that Renaissance had acquired three Central American gold mines and was the "Leading Gold Producer in Latin America."

14. On January 8, 2003, Renaissance issued a press release headlined, "Renaissance Acquires Major Portfolio of Gold Producing Assets in Latin America" ("January 8 Press Release"). This headline was false and materially misleading because Renaissance had not acquired any assets, but had merely signed a non-binding letter of intent to acquire the three mining properties from a private company called Central American Mine Holdings Limited ("CAMHL"). The release also failed to disclose that, at the time, Renaissance lacked the financial resources to acquire the gold mines and had to raise funds for that purpose.

15. The January 8 Press Release also quoted Park as stating that "Renaissance has successfully made the leap from exploration to production in the space of a few short months." In combination with the headline, this statement created the false appearance that Renaissance had acquired the gold mines. The release also failed to disclose several material facts and contingencies about these purported mining acquisitions, including that: (i) the acquisitions were contingent on Renaissance first becoming a publicly-traded company through the acquisition of a public shell company; (ii) Renaissance would be required to make significant additional payments to, and assume significant debts from, CAMHL; and (iii) Renaissance would be ceding

4

control of its board of directors and outstanding shares to CAMHL's principals within six months of closing.

16. The January 8 Press Release also presented a misleading picture of the "gold producing" assets that Renaissance had purportedly acquired. For example, the release said that one mine "[wa]s to resume production in February [2003] and produce 75,000 ounces of gold in 2003 and 85,000 ounces of gold in 2004 and 2005," while omitting the material facts that such projections were unverified and could not be achieved without Renaissance first obtaining millions of dollars in financing.

17. The January 8 Press Release also referred readers to Renaissance's website, which created the false impression that Renaissance actually owned the Central American gold mines and was engaging in actual mining operations. The website's home page contained several photographs depicting active mining operations and a large revolving banner stating "Renaissance Mining/Leading Gold Producer in Latin America." In fact, at that time, Renaissance did not own any gold mines and was not engaged in mining operations.

18. Renaissance's website also included a long "mission statement" from Park, in which he explained, "We have successfully built a portfolio of producing gold mines and economic deposit [sic] in Central America . . . . Renaissance has successfully made the leap from exploration to production in the space of a few short months, in what normally is a cycle of several years." In a separate part of the website, under the misleading heading "Production and Reserves, Central and South America," Renaissance further claimed that it had "acquired an extensive portfolio of producing gold mines and economic gold deposits in Nicaragua and Panama," and described each of those mines (as well as specific figures for gold production and reserves) as if Renaissance had already owned the mines.

5

19. With Park's knowledge, Renaissance publicly disseminated the January 8 Press Release to prospective investors. Park participated in the preparation of Renaissance's January 8 Press Release and the content of Renaissance's website, and he knew, or was reckless in not knowing, that they contained false and materially misleading information.

20. At the time that Renaissance was disseminating the false and misleading statements described above in paragraphs 14-19, Renaissance was attempting to carry out a series of transactions whereby it would: (i) acquire the three Central American gold mines that it publicly claimed that it owned; (ii) raise approximately $6 million in a purportedly private stock offering (the "Offering") in order to acquire and reactivate the mines; and (iii) merge with the publicly-traded Sedona shell company to take the newly-formed mining company public. To effect those transactions, Renaissance misled public investors into believing that they could invest in Central American gold mines purportedly owned by *Renaissance* by purchasing *Sedona* stock on the OTCBB – even though Renaissance had not merged with Sedona and did not own the mines – and as a result, investors purchased Sedona stock at artificially inflated prices.

21. Renaissance planned the Offering to coincide closely with its announcement of its merger with Sedona – on or about January 21, 2003. Renaissance solicited numerous investors, many of whom, after receiving Renaissance's Offering Memorandum, responded by submitting executed subscription agreements and transferring funds to Renaissance.

22. Renaissance's Offering Memorandum contained several material misrepresentations, including that Sedona's last recorded trade had occurred at a price of $5.00 per share (in fact, Sedona had last traded at $.03 per share in May 2002), and that Sedona's officers and directors had resigned on January 17 and had been replaced by Park (as chief executive officer and director) and another individual (as chairman). The Offering

Memorandum also failed to disclose several material facts regarding the actual cost of acquiring the gold mines from CAMHL, Renaissance's assumption of significant debt from CAMHL, and CAMHL's ultimate control of Renaissance's board of directors. Park drafted or reviewed the Offering Memorandum and shared responsibility for these material misstatements and omissions.

23. On January 17, 2003, Renaissance issued another press release announcing that Renaissance had signed a letter of intent to merge with Sedona ("January 17 Press Release"). The release, as with Renaissance's Offering memorandum, falsely claimed that Sedona's officers and directors had resigned on January 17 and had been replaced by Park (as chief executive officer and director) and another individual (as chairman). The release also made reference to Renaissance's misleading January 8 Press Release concerning the company's purported mining acquisitions, as well as Renaissance's false and misleading website.

24. The January 17 Press Release also identified a Bermudian securities firm as Renaissance's investment banker and highlighted its role as underwriter of the $6 million stock Offering without disclosing the material fact that two principals of the Bermudian firm had recently acquired and controlled ninety-nine percent of Sedona's outstanding shares. By failing to disclose the Bermudian firm's controlling interest in Sedona, the release created the misleading impression that an independent investment banking firm had evaluated the merits of the Renaissance/Sedona merger and agreed to serve as underwriter for Renaissance's Offering.

25. The January 17 release was disseminated via Renaissance's website, other gold-related websites, and broadcast e-mails by Renaissance to potential investors. On the morning of January 21, before the U.S. markets opened, Business Wire published a press release issued by Sedona announcing its letter of intent to merge with Renaissance. Sedona's press release was substantially identical to Renaissance's January 17 Press Release.

26. Renaissance had planned its $6 million Offering as an unregistered, but exempt, private offering pursuant to Securities Act Regulation D [17 C.F.R. §§ 230.501 - 230.508], which provides an exemption from registration under the Securities Act for certain limited offers and sales of securities. To qualify for a Regulation D exemption, the issuer must, among other things, satisfy the conditions of Securities Act Rule 502(c) [17 C.F.R. § 230.502(c)], which prohibits offers or sales by means of "any form of general solicitation or general advertising, including, but not limited to ... [a]ny advertisement, article, notice or other communication published in any newspaper, magazine, or similar media or broadcast...."

27. Renaissance's January 17 and January 21 press releases were communications which were disseminated publicly through the media, and constituted forms of "general solicitation or general advertising." Therefore, the Offering failed to qualify for the exemption provided by Regulation D and was subject to the registration requirements of the federal securities laws. Renaissance thus unlawfully offered and sold its securities to the public without registration or a valid exemption.

28. As an officer and director of Renaissance, Park shared responsibility for preparing the January 17 Press Release and January 21 press release and he knew, or was reckless in not knowing, that the releases contained false and materially misleading information, and that the releases would be publicly disseminated.

29. Park also knew, or was reckless in not knowing, that certain newsletter writers issued research reports to public investors in the days preceding the announcement of the Renaissance/Sedona merger that conveyed to investors the false and misleading information that Renaissance had "acquired" the Central American mining assets, and that Renaissance's stock

8

would be available for purchase on January 21, 2003 for approximately $10 per share under the OTCBB symbol "SSSI" (Sedona).

30. On January 21, 2003, Renaissance and Sedona announced their merger and numerous public investors purchased Sedona stock at between $9 and $10 per share. Those investors purchased Sedona stock at artificially inflated prices based on false and materially misleading information about Renaissance and Sedona that Park and others, directly or indirectly, had disseminated with knowledge, or reckless disregard, of the false and materially misleading nature of the information.

31. On January 29, 2003, the Commission suspended trading in Sedona's stock.

## CLAIM ONE

### Violations of Section 17(a) of the Securities Act
### [15 U.S.C. § 77q(a)]

32. Paragraphs 1 through 31 are hereby realleged and incorporated by reference.

33. Defendant Park, by engaging in the conduct described above, directly or indirectly, by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, in the offer or sale of the securities:

    a. employed devices, schemes, or artifices to defraud;

    b. obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    c. engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon the purchaser.

34. By reason of the foregoing, defendant Park, directly or indirectly, violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## CLAIM TWO
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5]

35. Paragraphs 1 through 31 are hereby realleged and incorporated by reference.

36. Defendant Park, by engaging in the conduct described above, directly or indirectly, by use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of securities:

   a. employed devices, schemes, or artifices to defraud;

   b. made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

   c. engaged in acts, practices, or courses of business which operated or would have operated as a fraud or deceit upon any person.

37. By reason of the foregoing, defendant Park, directly or indirectly, violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5].

## CLAIM THREE
### Sections 5(a) and 5(c) of the Securities Act
### [15 U.S.C. §§ 77e(a) and 77e(c)]

38. Paragraphs 1 through 31 are hereby realleged and incorporated by reference.

39. Defendant Park, by engaging in the conduct described above, directly or indirectly, and without a registration statement in effect:

   a. Made use of the means or instrument of transportation or communication in interstate commerce or of the mails to sell securities through the use or medium of any prospectus or otherwise;

   b. Carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities for the purpose of sale or for delivery after sale; and

   c. Made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise securities, without a registration statement having been filed as to those securities.

40. By reason of the foregoing, defendant Park violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

**WHEREFORE,** Plaintiff Securities and Exchange Commission requests that the Court:

i. Enjoin defendant Park from violating, directly or indirectly, Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)] and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder [15 U.S.C. § 78j(b);17 C.F.R. § 240.10b-5];

ii. Order defendant Park to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

iii. Grant such other relief as this Court may deem just and proper.

Dated: December 19, 2007

Respectfully submitted,

David Williams (Pro Hac Vice)
Mark A. Adler (MA-8703)
Antonia Chion
Yuri B. Zelinsky
Michael A. Ungar
Ivonia K. Slade
Scott F. Weisman

Attorneys for Plaintiff

SECURITIES AND EXCHANGE COMMISSION
100 F Street, NE
Washington, DC 20549
Tel: 202-551-4548 (Williams)
Fax: 202-772-9362
Email: williamsdav@sec.gov